Kim D. Cannon (Wyoming State Bar #5-1401)
J. Mark Stewart (Wyoming State Bar #6-4121)
Davis & Cannon, LLP
40 South Main
P.O. Box 728
Sheridan, WY 82801
Telephone:     (307) 672-7491
Facsimile:     (307) 672-8955
cannon@davisandcannon.com
mark@davisandcannonchey.com

John A Hutchings (*pro hac vice*)
Dill Dill Carr Stonbraker & Hutchings, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone:          (303)777-3737
Facsimile:     (303) 777-3823
jhutchings@dillanddill.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| NAOMI L. MILES REVOCABLE TRUST, NAOMI L. MILES, TRUSTEE, and CHARLES W. MILES, JR. TRUST, NAOMI L. MILES TRUSTEE, | ) ) ) ) ) | Case Nos.   10-CV-0034-D 10-CV-0120-D |
| Plaintiffs, | ) | |
| v. | ) ) | |
| DENNIS R. LAWRENCE, et al. | ) ) | |
| Defendants. | ) ) | |
| **AND** | ) ) | |
| THE MARTHA W. GIBBS REVOCABLE TRUST, SUSAN GIBBS, SCOTT M. GIBBS, AND JAMES W. GIBBS, TRUSTEES, et al. | ) ) ) ) ) | |
| Plaintiffs, | ) | |

1

v.

DENNIS R. LAWRENCE, et al.

       Defendants

## PLAINTIFFS' RESPONSE TO SECORE & WALLER, LLP's
## MOTION TO STAY PROCEEDINGS AND TO COMPEL ARBITRATION

Based upon an arbitration clause contained in Subscription Agreements between the Naomi L. miles Revocable Trust, Naomi L. Miles Trustee (the "Miles Trust") and Shale Royalties 4, Inc. ("SR-4"), the Miles Trust and Shale Royalties 12, Inc. ("SR-12"), and the Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees (the "Gibbs Trust") and SR-12, Secore & Waller, LLP ("Secore & Waller") moves this Court to stay the claims of the Plaintiffs in the Miles case and the claims of the Gibbs Trust against Secore & Waller and compel that all such claims be submitted to arbitration pursuant to the provisions of the arbitration clause.  The "Miles case" is the above captioned case of *Naomi L. Miles Revocable Trust, Naomi L. Miles, Trustee, et al v. Dennis R. Lawrence, et al*, Case No. 10-CV-0034.  The "Gibbs case" is the above-captioned case of *Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, et al v. Dennis R. Lawrence, et al*, Case No. 10-CV-0120-D.

In the Miles case both the Miles Trust and the Charles W. Miles, Jr. Trust, Naomi L. Miles, Trustee (the "Credit Trust") have brought claims related to their purchase of preferred stock in SR-4 and SR-12 against Secore & Waller.  In the Gibbs case, the Gibbs Trust has brought claims against Secore & Waller related to its purchase of preferred stock in SR-12.

Secore & Waller drafted the private placement memoranda upon which the Miles Trust, the Credit Trust, and the Gibbs Trust based their purchase of preferred stock in SR-4 and SR-12

2

(Affidavit of Joan Waller, ¶¶ 18 and 19, Miles Doc. 72-2; Gibbs Doc. 52-1)[1]. The Subscription Agreements for the purchase of preferred stock in SR-4 and SR-12 are part of the private placement memoranda and thus pursuant to the admissions of Secore & Waller, also drafted by Secore & Waller (see complete Confidential Private Placement Memoranda of Shale Royalties 4, Inc. and Shale Royalties 12, Inc. referred to respectively as Exhibits 1 and 2). The complete Confidential Private Memorandum for each of SR-4 and SR 12 includes the Subscription Agreement containing the arbitration clause upon which Secore & Waller base its Motion to Stay Proceedings and Compel Arbitration of the claims of the Miles Trust, the Credit Trust, and the Gibbs Trust.

The issue before this Court pursuant to Secore & Waller's Motion to Compel Arbitration is the enforceability of the arbitration clause contained in the Subscription Agreements. The arbitration clause provides in relevant part the following:

> IN THE EVENT THAT A DISPUTE ARISES BETWEEN THE UNDERSIGNED OR ANY SUCCESSOR, TRANSFEREE OR ASSIGN AND THE CORPORATION OR ANY SECURITIES BROKER-DEALER OR INVESTMENT ADVISER HAVING SUPERVISORY RESPONSIBILITIES REGARDING ANY OFFICER OR DIRECTOR OF THE CORPORATION OR REGARDING ANY INVESTOR ACCOUNT, OR ANY SECURITIES BROKER-DEALER EMPLOYED BY THE CORPORATION OR ON ITS BEHALF AS A PLACEMENT OR SELLING AGENT, OR ANY OF <u>THEIR</u> OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, <u>ATTORNEYS</u>, AFFILIATES, ACCOUNTANTS, INVESTMENT ADVISORS OR CONSULTANTS, SAID DISPUTE ARISING OUT OF, IN CONNECTION WITH OR AS A RESULT OF THE PURCHASE OR OTHER ACQUISITION OF A SECURITY ISSUED BY THE CORPORATION, THE FORMATION OF THE CORPORATION, THE MANAGEMENT OF THE CORPORATION, OR THE ACQUISITION, MANAGEMENT OR DISPOSITION OF ANY INVESTMENT, INCLUDING ANY DISPUTE REGARDING THE

---

[1] The Miles Trust, the Credit Trust, and the Gibbs Trust are collectively referred to as the "Trusts."

APPLICATION OF THIS ARBITRATION AGREEMENT, THE UNDERSIGNED HEREBY EXPRESSLY AGREES THAT SAID DISPUTE SHALL BE RESOLVED THROUGH BINDING ARBITRATION RATHER THAN LITIGATION.

(emphasis added).

By its very terms, the arbitration clause is an agreement between the "undersigned" and the "Corporation."  "Corporation" is defined in the introductory paragraph as the entity issuing the preferred stock, either SR-4 or SR-12 as the case may be.  It is also a capitalized term referring to SR-4 and SR-12 throughout the Subscription Agreements.  The term "undersigned" is not defined in the Subscription Agreements.  Signatories to the Subscription Agreements were the purchaser, either the Miles Trust with respect to purchases of SR-4 and SR-12 stock, and the Gibbs Trust with respect to the purchase of SR-12 stock.  Also signing the Subscription Agreements is a representation of SR-4 or SR-12, as the case may be, a signature by the Managing Dealer, and a signature by the Selling Dealer (SR-4) or the selling representative (SR-12).  There were thus multiple "undersigneds" to the Subscription Agreements (see Subscription Agreements attached hereto as Exhibits 3, 4, 5, and 6).

Secore & Waller admits that it is nowhere identified within the arbitration clause, within the Subscription Agreements, within the private placement memoranda of the SR-4 and SR-12 offerings or within any other offering document related to SR-4 or SR-12.  It is thus undisputed that none of the Trusts had any knowledge of the existence of Secore & Waller or its relationship to the offering of preferred stock by SR-4 and SR-12.  The omission of Secore & Waller's name from any written material connected with SR-4 and SR-12 was intentional.  Joan Waller states in her Affidavit:

Secore & Waller does not permit its name to be used to market investments.

4

Secore & Waller's name is not provided in the private placement memoranda for Shale Royalties 4, Inc. and Shale Royalties 12, Inc.

(Affidavit of Joan Waller, ¶ 22; Miles Doc. 72-2, p. 7). It is further the assertion of Secore & Waller that the private placement memoranda of SR-4 and SR-12, containing the Subscription Agreements including the arbitration clause, is not attributable to it but, instead, "[m]ust be attributed to Provident Royalties, LLC ("Provident"), its subsidiaries, employees, brokers or agents." (Affidavit of Joan Waller, ¶ 32; Miles Doc. 72-2, p. 8).

Secore & Waller is not a signatory to the Subscription Agreements containing the arbitration clause. Secore & Waller's name is found nowhere in the Subscription Agreement nor any other written material pertaining the offering of preferred stock of SR-4 and SR-12 which was provided to any of the Trusts. Thus, the sole basis upon which Secore & Waller asserts that it is entitled to the benefit of the arbitration clause in the Subscription Agreements is based upon the word "attorneys" found in the arbitration clause. Secore & Waller asserts that as drafted, the word "attorneys" refers to attorneys of the "Corporation," and it is thus a third party beneficiary of the arbitration clause and entitled to enforce the clause. Finally, Secore & Waller asserts that the Subscription Agreements, including the arbitration clause, are to be governed and construed in accordance with the laws of the State of Texas.

The issues for this Court to determine in Secore & Waller's Motion to Compel Arbitration are as follows:

1.      Is Secore & Waller an intended third-party beneficiary of the arbitration clause such that it can enforce the arbitration clause against the Trusts.

2.      Assuming Secore & Waller can establish its status as an intended third party beneficiary of the arbitration clause, can it enforce the arbitration clause against a non-signatory

to the Subscription Agreement, the Credit Trust.

       3.     Did Martha Gibbs, the Trustee of the Gibbs Trust, who executed the Subscription Agreement for the Gibbs Trust pursuant to which it purchased $135,000 of preferred stock in SR-12, lack sufficient mental capacity to enter into the Subscription Agreement, thus rendering unenforceable the arbitration clause.

      Should the Court determine Secore & Waller is not an intended third party beneficiary of the arbitration clause entitling it to enforce the arbitration clause against the Miles Trust, the Credit Trust, and the Gibbs Trust, the Court then need not reach issues two and three.

## SECORE & WALLER IS NOT AN INTENDED THIRD PARTY BENEFICIARY

      Secore & Waller is not named in the arbitration clause nor is it a signatory to the Subscription Agreements.  Secore & Waller's name nowhere appears in the Subscription Agreements or any other document provided to the Trusts related to their purchases of SR-4 and SR-12 stock.  The arbitration clause is ambiguous as to whether the word "attorneys" means or clearly includes Secore & Waller.  For this reason, Secore & Waller cannot show that it was an "intended third party beneficiary" within the meaning of applicable law.

## The Federal Arbitration Act is Applicable

      The Trusts agree that the Federal Arbitration Act ("FAA") is applicable.  The FAA provides that arbitration clauses in commercial contracts "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract".  9 U.S.C. § 2.  Although the Supreme Court has held that the FAA preempts state laws and policies regarding arbitration, *Southland Co. v. Keating*, 465 U.S. 1, 10-11, 104 S.Ct. 852 (1984), state contract law governs in determining whether the arbitration clause itself is validly

obtained, providing the contract law applied is general and not specific as to arbitration clauses. *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87, 116 S.Ct. 1652 (1996); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920 (1995). Secore & Waller asserts Texas state law applies to the construction and interpretation of the Subscription Agreements which includes the arbitration clause. Whether the Court applies Texas state law, or the law of the state where this Court is sitting, Wyoming, the result is the same.

### This Court Determines the Enforceability of the Arbitration Clause

The question of whether the parties have submitted a particular dispute to arbitration, that is, the question of arbitrability is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise. *Howsan v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588 (2002). A Court may compel arbitration in a particular dispute under Section 4 of the FAA (9 U.S.C. § 4) only when satisfied that the making of the agreement to arbitrate is not at issue. *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 403, 87 S.Ct. 1801 (1967). Since the arbitrability of the merits of the dispute depends on whether the parties agree to arbitrate that dispute, so the question of who has the primary power to decide arbitrability turns on what the parties agree to about that matter. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. at 943. Courts have held that broad provisions to arbitrate all disputes arising out of or relating to the overall contract, similar to the pre-dispute arbitration clause contained in the Subscription Agreements, does not provide the requisite clear and unmistakable evidence within the four corners of the agreement that the parties intended to submit the question of whether there exists a valid agreement to arbitrate to an arbitrator. *Reilly Manufacturing Company v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998). There is nothing in the pre-

dispute arbitration clause of the Subscription Agreements or any other provision of the Subscription Agreements that clearly and unmistakably evidences an agreement between the Trusts and Secore & Waller to submit the question of whether an agreement to arbitrate is enforceable to an arbitrator.   Lacking such clear and unmistakable evidence within the four corners of the Subscription Agreements, it is for the Court to determine whether the pre-dispute arbitration clause contained in the Subscription Agreements is enforceable.

Secore & Waller does not contend otherwise and has, in fact, submitted the question of whether there exists a valid agreement to arbitrate between the Trusts and Secore & Waller to this Court for determination.   Secore & Waller has, however, requested that this Court rule upon its Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Rule 12(b)(2) as well as its Motion to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) before ruling on this Motion to Compel Arbitration.   A ruling upon Secore & Waller's Rule 12(b)(2) Motion, prior to ruling on the Motion to Compel Arbitration, is appropriate, for if this Court lacks personal jurisdiction over Secore & Waller, then it would not be proper for the Court to determine Secore & Waller's claim of enforceability of the arbitration clause.   However, Secore & Waller's request that if this Court determines it has personal jurisdiction over Secore & Waller, it rule upon Secore & Waller's Rule 12(b)(6) Motion prior to determining its Motion to Compel Arbitration is inconsistent with its assertion it is entitled to enforce the arbitration clause.   Such a request goes to the merits of the Trusts' claims.   If, as Secore & Waller contends, arbitration of the merits of the Trusts' claims is required, then a determination of whether the Trusts have properly stated a claim is to be determined by the arbitrators.   Asking this Court rule on its 12(b)(6) Motion prior to the Motion to Compel amounts to forum shopping and is improper.

*Hoxworth v. Blinder, Robinson & Company, Inc.*, 980 F.2d 912 (3rd Cir. 1992); *Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 13 (1st Cir. 2005).  Further, Rule 12(b)(6) motions are not provided for in the arbitration rules and are rarely, if ever, considered by the arbitrators.  Availing oneself of process not available in an arbitral forum may constitute a waiver of one's right to compel arbitration.  *Hoxworth,* 980 F.2d at 925-926; *Marie*, 402 F.3d at 13.  The Court should properly determine Secore & Waller's Motion to Compel Arbitration prior to reaching its Rule 12(b)(6) Motion.  On the other hand, should Secore & Waller persist that this Court determine its Rule 12(b)(6) Motion prior to its Motion to Compel Arbitration, the Trusts contend that Secore & Waller has impliedly waived any right it has to compel arbitration and its Motion to Compel Arbitration should be denied on such basis.

<u>**The Arbitration Clause is Ambiguous**</u>

Secore & Waller is not named in the arbitration clause.  Secore & Waller did not sign the Subscription Agreements containing the arbitration clause.  Secore & Waller's name nowhere appears in any of the offering material of the preferred stock of SR-4 and SR-12.  The existence of Secore & Waller was unknown to the Trusts at the time of their entry into the Subscription Agreements containing the arbitration clauses.   The arbitration clause contains the word "attorneys."  It is ambiguous as drafted what the word "attorneys" means.  A contract, agreement or writing is generally construed against the drafter.  *State Farm Fire & Casualty Company v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998); *Lopez v. Muñoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 866 (Tex. 2000).

The word "attorneys" appears amongst a litany of classifications including officers, directors, employees, representatives, affiliates, accountants, investment advisors, and

consultants.  Attorneys, and such other categories are modified by the word "their."  What the word "their" refers to is unclear and ambiguous.  For example, does the word "their" refer to:

1.      Those listed immediately preceding the "their" and prior to the immediately preceding comma which would limit "attorneys" to "any securities broker-dealer employed by the Corporation or on its behalf as a placement or selling agent,";

2.      Other categories referred to in the next preceding clause, thereby including "any investment advisor having supervisory responsibilities regarding any officer or director of the Corporation or regarding any investor account,";

3.      The next preceding clause, thereby including in addition to the foregoing categories "any securities broker-dealer,"; or

4.      All of the foregoing and the "Corporation."

Furthermore, does the word "attorney" include any attorney who has ever been an attorney for any of the categories of individuals and entities preceding the use of the word "attorney" at any time for any matter or does it include "attorneys" only related to the offering of preferred stock in SR-4 and SR-12.  Does "attorney" refer to a landman retained by the officer of a broker-dealer to research a title to a particular piece of oil and gas property.  By virtue of the fact that Secore & Waller sought to hide its identity in its role in Provident's fraudulent Ponzi scheme, it did not include its name within the Subscription Agreements or the arbitration clause.  Had Secore & Waller done so, the arbitration clause may very well have been unambiguous with respect to Secore & Waller's inclusion within the scope of those intended to be benefitted by the arbitration clause.  However, the failure of Secore & Waller, as the drafter of the arbitration clause, to have specifically included itself in the provisions of the arbitration clause, renders the

clause ambiguous as to whether there is a clear intent to benefit Secore & Waller by both the Corporation and the Trusts.

The question of whether ambiguity exists is a question of law which is determined by the Court. *The Prudential Preferred Properties v. Underwood Ranch Company*, 873 P.2d 598, 600 (Wyo. 1994). A contract is ambiguous if it is obscure in its meaning because of indefiniteness or expression or because it contains a double meaning. *Mountain View/Evergreen Improvement and Service District v. Casper Concrete Company*, 912 P.2d 529, 532 (Wyo. 1996). Any ambiguity in the contract requires that it be construed against the drafter. *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1111, n. 10 (10th Cir. 1991).

Strictly construing the arbitration clause against Secore & Waller as its drafter, as required by both Texas and Wyoming law, does not entitle Secore & Waller to the expansive reading of the meaning of "their . . . attorneys" such as to reference all the way back to the beginning of the clause to include the "Corporation," SR-4 and SR-12. A strict reading of "their . . . attorneys" limits the reference back to only "any securities broker-dealer employed by the Corporation or on its behalf as a placement or selling agent, . . ." a separately punctuated clause immediately preceding "their . . .attorneys."

## Secore & Waller is Not an Intended Third Party Beneficiary of the Arbitration Clause

The ambiguity of the arbitration clause, strictly construed against Secore & Waller as the drafter, precludes a determination that Secore & Waller is an intended third party beneficiary of the arbitration clause. Texas has clearly stated the legal rule governing third party beneficiaries as follows:

First, there is a presumption against conferring third party beneficiary status on non-contracting parties. In deciding whether a third party may enforce or

challenge a contract between others, it is the contracting party's intent that controls. <u>The intent to confer a direct benefit upon a third party must be clearly and fully spelled out or enforcement by the third party must be denied.</u> Incidental benefits that may flow from a contract to a third party do not confer the right to enforce the contract. <u>A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit.</u> To qualify as one for whose benefit a contract was made, the third party must benefit more than incidentally; he must either be a donee or creditor beneficiary. A person is a donee beneficiary if the performance promised will come to him as a pure donation. If performance will come to satisfy a duty or legally enforceable commitment owed by the promisee, then the third party is considered a creditor beneficiary. (emphasis added)

*South Texas Water Authority v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007). Under Texas law, Secore & Waller's contention that it is an intended third party beneficiary in the arbitration clause fails for numerous reasons. The Subscription Agreements were not entered into to secure for Secore & Waller any benefit whatsoever as required. The Subscription Agreements were entered into between SR-4 or SR-12 and the Miles Trust and the Gibbs Trust for the purpose of SR-4 or SR-12 selling to them its preferred stock. There was no purpose or intent in entering into the Subscription Agreement to benefit Secore & Waller in any way. Secore & Waller has made no assertion to the contrary.

It is far from clearly and fully spelled out that the intent of SR-4 and SR-12 and the Miles Trust and the Gibbs Trust was to confer a <u>direct benefit</u> on Secore & Waller in the Subscription Agreements and the arbitration clause. The arbitration clause is ambiguous as to whether there is any intent, even incidentally, to benefit Secore & Waller. As a result of the ambiguity, Secore & Waller cannot even show it was an incidental third party beneficiary. However, even if this Court accepts Secore & Waller's interpretation of the arbitration clause, it is nothing more than an incidental beneficiary as: (1) the Subscription Agreements were not entered into amongst the

12

parties to confer a direct benefit on Secore & Waller; and (2) intent to confer a direct benefit on Secore & Waller is not clearly and fully spelled out.  Under Texas law, the law Secore & Waller asserts should be applied to construction of the arbitration clause, it is not an intended third party beneficiary of the arbitration clause and thus is not entitled to enforcement for its benefit.

Wyoming law is no different than Texas law.  *Wyoming Machinery Company v. United States Fidelity & Guaranty Company.*, 614 P.2d 716, 720 (Wyo. 1980) (an outsider claiming the right under a contract must show that it was intended for his direct benefit.  An incidental beneficiary acquires no rights under the contract).  *Cordero Mining Company v. United States Fidelity and Guaranty Company*, 67 P.3d 616, 622 (Wyo. 2003) (stating that the focus of the Restatement (Second) of Contract, § 302 is the intent of the contracting parties, not reliance by the beneficiary).

In a situation analogous to the present, where as attorneys for SR-4 and SR-12, Secore & Waller is asserting the benefit of an arbitration clause contained in an agreement to which it is not a party, Courts have almost uniformly held that an introducing broker is not a third party beneficiary of a customer agreement between the investor and a clearing broker, even when the introducing broker's name appears within the customer agreement and is known by the investor. *O'Connor v. R.F. Lafferty & Company, Inc.*, 965 F.2d 893, 901-02 (10th Cir. 1992).  In this instance, Secore & Waller intentionally made sure its name was not known to the investors, the Trusts, as its name nowhere appears within the arbitration clause, the Subscription Agreements, or any offering material provided to the Trusts.  It simply cannot be said that the arbitration clause or the Subscription Agreements clearly and fully spell out the intent by the Trusts to confer a <u>direct benefit</u> on Secore & Waller when its existence was known to the Trusts.  Further,

there is no contention by Secore & Waller that the Subscription Agreements were entered into directly for Secore & Waller's benefit.   It is obvious from a reading of the Subscription Agreements that they were entered into to effectuate the sale of preferred stock from SR-4 or SR-12 to the Trusts.

Lacking the status of independent third party beneficiary, Secore & Waller has no right to enforce the arbitration clause against the Trusts.   Therefore, Secore & Waller's Motion to Compel Arbitration should be denied.

## THE CREDIT TRUST DID NOT AGREE TO ARBITRATE

Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to so submit.   *Howsan v. Dean Witter Reynolds, Inc.*, 537 U.S. at 83.   Secore & Waller acknowledges that there is no agreement to arbitrate between the Credit Trust and Secore & Waller, and there is no agreement to arbitrate between the Credit Trust and SR-4 which contains an arbitration clause of which Secore & Waller can assert third party beneficiary status.   Secore & Waller asserts that because the Credit Trust's purchase of preferred stock in SR-4 was structured through a sham loan transaction pursuant to which the Miles Trust was the purchaser of the preferred stock and the signor of the Subscription Agreement containing the arbitration clause, the Credit Trust should still be required to arbitrate. This argument appears to be based, at least in part, upon Secore & Waller's speculation that had the Credit Trust made the purchase in its name and disclosed it was not an "accredited investor" SR-4 would have rejected the proposed subscription.   This is nothing more than pure speculation on Secore & Waller's part.   The much more plausible inference is that in view of Provident's fraudulent Ponzi scheme which defrauded approximately 7, 700 investors, including the Credit

Trust, of approximately half a billion dollars, that even if SR-4 or Provident had known of the Credit Trust's unaccredited status, it still would have taken its money. In either event, the issue is irrelevant to whether the Credit Trust can be compelled to arbitrate by Secore & Waller when neither party signed an agreement to arbitrate.

Importantly, the Credit Trust's claims against Secore & Waller are not related to the sham loan transaction alleged in the Amended Complaint. The Credit Trust's claims against Secore & Waller relate to Secore & Waller's role in Provident's fraudulent Ponzi scheme as alleged in the Amended Complaint. It is Secore & Waller's role in Provident's fraudulent Ponzi scheme which gives rise to its liability not only to the Credit Trust, but the Miles Trust and the Gibbs Trust. This has nothing to do with the alleged "sham loan transaction" structured by other Defendants Dennis R. Lawrence and Randall Pope. The Credit Trust's claims arise from Secore & Waller's role as attorneys for Provident and all of its offering entities, including SR-4, consisting of formation of the entities, drafting the private placement memoranda, and purportedly effecting exemptions from the registration provisions of federal and state securities laws.

The Credit Trust does not assert that it was an intended beneficiary of the Subscription Agreement for the preferred stock of SR-4, as asserted by Secore & Waller, but rather that it was defrauded as part of Provident's fraudulent Ponzi scheme, participated in by Secore & Waller. The Credit Trust's claim against Secore & Waller, as well all other Defendants in this case, is not based upon agency law or any agent-principal relationship between it and the Miles Trust. The Credit Trust's claim against Secore & Waller is based upon Secore & Waller's role in Provident's fraudulent Ponzi scheme.

Simply, Secore & Waller seeks to compel the Credit Trust arbitrate its claim against it when neither Secore & Waller nor the Credit Trust were signatories to or parties to any agreement to arbitrate.  This position is completely contrary to the most basic premise that a party cannot be required to submit to arbitration any dispute to which it has not agreed.  *Howsan v. Dean Witter Reynolds, Inc.*, 537 U.S. at 83.  Secore & Waller cites no case, nor could the Trusts locate any case, in which there was compelled to arbitration the claims of one party against another, where neither was party to an arbitration agreement.  Under certain circumstances, Courts will permit a non-signatory to compel a signatory to an arbitration agreement to arbitration, such as where the non-signatory can establish it is an intended third party beneficiary.  In other cases, Courts will compel a non-signatory to an arbitration agreement to arbitrate the claims of a signatory to an arbitration agreement when the non-signatory has manifested some consent to otherwise arbitrate, such as, a FINRA member who, pursuant to FINRA Rules, is required to arbitrate customer claims.  However, no case could be located which compelled to arbitration claims where neither party was a signatory to an arbitration agreement.  Such is the case of the Credit Trust's claims against Secore & Waller.  Under applicable law, the Credit Trust cannot be compelled to arbitrate its claims against Secore & Waller.

## THE GIBBS TRUST LACKED MENTAL CAPACITY TO CONTRACT

In *Prima Paint*, the Supreme Court held that in the context of a fraud in the inducement challenge, the "making" of an agreement for arbitration is at issue when there is an independent challenge to the arbitration clause itself rather than to the entire agreement.  *Prima Paint*, 388 U.S. at 403-04.  *Prima Paint* established that arbitration clauses as a matter of law are separable

from the contract in which they are imbedded and unless the fraud was directed to the arbitration clause itself, rather than the entire agreement, the arbitration clause will be enforced.   Thus, *Prima Paint* established that fraud in the inducement of the contract as a whole was insufficient to preclude enforcement of the arbitration clause, instead it must be established that the fraud in the inducement was as to the arbitration clause itself.   Courts have expanded this separability holding into other defenses.   *Geske v. Brooks*, 875 F.2d 71, 75 (4th Cir. 1989) (holding that unconscionability and lack of consideration defenses challenging the entire contract, rather than the arbitration clause itself, are for the arbitrator to decide); *UnionMutual Stock Life Insurance Company v. Beneficial Life Insurance Company*, 774 F.2d 524, 529 (1st Cir. 1985) (same with mutual mistake and frustration of purpose); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 637 F.2d 391, 398 (5th Cir. 1981) (same with duress and unconscionability); *Commonwealth Edison Company v. Gulf Oil Corp.*, 541 F.2d 1263, 1271 (7th Cir. 1976) (same with frustration of performance).   However, as to the defense of mental capacity, Courts have held such defense goes to the formation or very existence of the contract and therefore separability is not applied when the challenge to the enforcement of the arbitration clause is the lack of mental capacity to contract.   *Spahr v. Secco*, 330 F.3d 1226, 1271-73 (10th Cir. 2003); *In re Morgan Stanley & Company, Inc.*, 293 S.W.3d 182, 185-190 (Tex. 2009).

In *Spahr*, the complaint alleged the plaintiff, Spahr, suffered from dementia and Alzheimer's disease and thus did not have sufficient mental capacity to understand the nature and effect of the contract.   The Tenth Circuit held that a mental capacity challenge can logically only be directed at the entire contract.   The Tenth Circuit held that Spahr's mental incapacity defense naturally goes to both the entire contract and the specific agreement to arbitrate.   He

lacked the mental capacity to enter into an enforceable contract and place the "making" of the agreement to arbitrate at issue under Section 4 of the FAA.  On this basis, the Court refused to enforce the arbitration clause against Spahr.

*In re Morgan Stanley & Company, Inc.*, the claimant resisted arbitration on the grounds that she lacked the mental capacity to assent to the contract when she signed account agreements with arbitration clauses.  The Texas Supreme Court noted the differentiation between a defense raising an issue of a contract's validity, such as fraud in the inducement, and a formation defense, raising the issue of whether a contract was ever concluded, such as the lack of mental capacity to assent.  The Texas Supreme Court determined that a defense which goes to the formation of a contract, in other words, raises the issue of the very existence of a contract, is a challenge to the validity of the arbitration provisions.  The Texas Supreme Court held that lacking the requisite mental capacity to contract, there can be no assent to arbitrate anything at all.  *In re Morgan Stanley & Company, Inc.*, 293 S.W.2d at 190.  The Gibbs Trust's Amended Complaint alleges the following:

1.      In mid-February of 2006, Martha W. Gibbs, the Trustee of the Gibbs Trust, underwent extensive back surgery and was in a rehabilitation facility from approximately mid-February of 2006 through October 30, 2006.  During such time she was physically disabled and mentally unable to make any significant investment or business decisions (Amended Complaint, ¶ 49).

2.      Between September 7, 2007 and April of 2008, Martha W. Gibbs underwent further surgery and extended rehabilitation as a result of such surgery.  By May of 2008, Martha W. Gibbs' physical condition had become further debilitating and her mental capacity had

continued to diminish.  By May of 2008, she lacked the mental capacity to make informed investment decisions (Amended Complaint, ¶62).

3.      The allegations regarding the Gibbs Trust's purchase of $135,000 of preferred stock of SR-12 are made upon information and belief because Martha W. Gibbs, the then Trustee of the Gibbs Trust which made the purchase, is unable to recall any specific facts regarding the transaction (Amended Complaint, ¶ 63).

The Affidavit of Susan Gibbs, the daughter of Martha W. Gibbs, filed with this Response, further elaborates upon Martha W. Gibbs' physical and mental condition in May and June of 2008.  The Affidavit of Susan Gibbs provides the further details:

1.      In August of 2007, Martha W. Gibbs was flown by Flight for Life, from Sheridan, Wyoming to Denver, Colorado, as the result of a sudden paralysis associated with an anesthesia-administered incident related to additional surgery.  She was hospitalized and moved to Elms Haven Rehabilitation Facility on September 6, 2007.  On October 1, 2007, she suffered a series of mini-strokes requiring her to be moved from Elms Haven Rehabilitation Facility.  However, on October 8, she was returned and stayed until April 26, 2008.

2.      In May and June of 2008, Martha W. Gibbs had just returned to her home in Buffalo, Wyoming.  Her capacity to read and absorb and legal documents or contracts was very limited.  She was frequently in pain, suffering spasms in her legs.  The pain, and medication she was then on, caused her to have a very limited attention span and she was unable to focus on a subject in conversation.

3.      Susan Gibbs directly observed that Martha W. Gibbs, her mother, had an increased diminishing mental capacity to understand business matters from 2006 to May of 2008

and that she did not seem to understand the nature and extent of investments she had made and the terms and circumstances of those investments.

4.      Susan Gibbs specifically states she does not think Martha W. Gibbs was mentally competent to understand the terms of her contract in May and June of 2008.

James W. Gibbs, a son of Martha W. Gibbs, has also filed an Affidavit providing further information regarding Martha W. Gibbs' diminished mental capacity in May and June of 2008. In his Affidavit, filed with this Response, James W. Gibbs states the following:

1.      He had occasion to observe his mother, Martha W. Gibbs, in May and June of 2008 when she returned from Elms Haven Rehabilitation Facility.

2.      James W. Gibbs observed that Martha Gibbs was on medication for pain, including Percocet, a muscle relaxant for leg spasms.

3.      He believed at the time, and believes currently, that Martha W. Gibbs suffers from a diminished mental capacity as a result of the taking of pain medication and muscle relaxants, as well as old age.

4.      Based upon such observations, he does not think Martha W. Gibbs was mentally competent to understand the terms of a contract and enter into a contract in May and June of 2008.

The evidence is undisputed that Martha W. Gibbs, the Trustee of the Gibbs Trust, who signed the Subscription Agreement containing the arbitration clause, lacked the mental capacity to contract.   Under such circumstances, she did not assent to arbitrate anything and the arbitration agreement cannot be enforced against her or the Gibbs Trust.

## **WYOMING LAW WOULD NOT ENFORCE THE ARBITRATION PROVISIONS**

The case of *Fox v. Tanner*, 101 P.3d 939 (Wyo. 2004) is factually similar to the circumstances of the Trusts' claims. In *Fox*, the Wyoming Supreme Court refused to enforce an arbitration provision. In *Fox*, the Tanners, the investors, had opened brokerage accounts. In short, the broker stole the money, never investing it as represented. When the Tanners discovered this, they sued not only the broker, but his supervisor and the brokerage company. The supervisor and the brokerage company moved to compel arbitration pursuant to the pre-dispute arbitration clauses contained in the account agreements signed by the Tanners when the account was opened. The Tanners asserted the arbitration agreements were unenforceable because under Wyoming law any contract that may have existed between the parties may be revoked based on fraud and that given the nature of the fraud, the Tanners did not intend to arbitrate such claims. The Wyoming Supreme Court noted that it is well established under Wyoming general contract law that fraud will render invalid and unenforceable a contract. *Id*. at 944. The Wyoming Supreme Court conducted a lengthy analysis recognizing the holdings of *Prima Paint, First Options of Chicago, AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415 (1986), and numerous other cases addressing the enforceability of arbitration agreements. The Wyoming Supreme Court also cited and quoted with approval the analysis of Richard C. Reuben in *First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provisions*, 56 SMU L.Rev. 819 (2003). Reuben's analysis suggests there is no rational basis for separating the determination of the validity of the contract as a whole and the validity of the arbitration clause. Ultimately, although it does not appear from the opinion that the Tanners (investors) ever showed that the arbitration clause, separate from the customer agreement, was fraudulently

induced, the Wyoming Supreme Court refused to enforce the arbitration clause pursuant to what appears to be a claim of fraud in the inducement of the entire contract.

In the present case, the Subscription Agreements supported a fraudulent Ponzi scheme. As in *Fox*, it is equally absurd to think that the Subscription Agreements as a whole, were any more or less fraudulently induced than the arbitration clause contained within the Subscription Agreements.  Under the rational holding of *Fox*, because the Subscription Agreements were fraudulently induced as part of an overall fraudulent Ponzi scheme, neither it nor the arbitration clause should be enforced.

## **CONCLUSION**

There exists grounds under both law and equity as to the unenforceability of the Subscription Agreements as a whole and the unenforceability by Secore & Waller of the arbitration clause.  The arbitration clause is not valid, irrevocable and enforceable pursuant to 9 U.S.C. § 2 and the Court is not compelled to order arbitration of the Trusts' claims against Secore & Waller pursuant to 9 U.S.C. § 4.  To the contrary, the arbitration clause contained within the Subscription Agreements is unenforceable against all of the Trusts.  For the reasons set forth herein, Secore & Waller's Motion to Stay Proceedings and Compel Arbitration should be denied.

Respectfully submitted this 1st day of October, 2010.

DAVIS & CANNON, LLP


By: *s/*_____
J. Mark Stewart
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Telephone:     (307) 634-3210
Facsimile:     (307) 778-7118
mark@davisandcannonchey.com

Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
P.O. Box 728
Sheridan, WY 82801
Telephone:     (307) 672-7491
Facsimile:     (307) 672-8955
cannon@davisandcannon.com

John A Hutchings (*pro hac vice*)
DILL DILL CARR STONBRAKER
   & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone:          (303)777-3737
Facsimile:     (303) 777-3823
jhutchings@dillanddill.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court

using the CM/ECF system which will automatically send email notification of such filing on the

1st day of October, 2010 to the following:

Jeffrey C. Brinkerhoff
Mark W. Gifford
Gifford & Brinkerhoff
jeff@giffordbrinkerhoff.com
mark@giffordbrinkerhoff.com

K Lawson Pedigo
Miller Keffer Bullock & Pedigo
KLPedigo@mkp-law.net

David A. Baugh
Baugh Dalton Carlson & Ryan, LLC
dbaugh@baughdaltonlaw.com

Charles W. Gameros, Jr.
Hoge & Gameros
bgameros@legaltexas.com

Thomas N. Long
Laura Jean Jackson
Long Reimer Winegard
tlong@lrw-law.com
ljackson@lrw-law.com

David F. DeFazio
DeFazio Law Office
david@defaziolaw.com

Jason Tangeman
Anthony Nicholas Goodrich & Tangeman
jtangeman@wyolegal.com

Rick L. Koehmstedt
Schwartz, Bon, Walker & Struder, LLC
rick@schwartzbon.com

Michael T. McConnell
Jared C. Lockwood
McConnell Fleischner Houghtaling &
Craigmile, LLC
mmcconnell@mfhc.com
jlockwood@mfhc.com

Thomas N. Fitzgibbon
Kimberly L. Thigpen
Pfeiffer Thigpen FitzGibbon & Ziontz LLP
tnf@ptflaw.com
klt@ptflaw.com

**and sent either electronically or by mail to:**
Nathan Glossi
605 E. Myrtle Street
Fort Collins, CO 80524
Email: nglossi@hotmail.com

_s/_____